**Law Offices of Louis J. Maione, Esq. (8589)**
**303 East 57th Street, 30th Floor**
**New York, N.Y. 10022**
**(917) 549-5693**
**Attorney for Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| New Fortune, Inc.,<br><br>　　　　　　　　　　　Plaintiff,<br><br>-against-<br><br>Apex Logistics International (CN) Ltd., and Aeroflot Airlines,<br><br>　　　　　　　　　　　Defendants. | _____Civ._____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, New Fortune, Inc. ("Plaintiff", "NFI" or "New Fortune"), by and through its attorney, Louis J. Maione, Esq., for its Complaint against the defendants, Apex Logistics International (CN) Ltd., ("Apex" or "Defendant"), and Aeroflot Airlines ("Aeroflot" or "Defendant") (collectively, the "Defendants") alleges herein, either upon personal knowledge or upon information and belief, as follows:

## INTRODUCTION

1.　　This is an action, *inter alia*, based on the negligence of the Defendants to timely ship and deliver in good order, Plaintiff's purchase of One Million (1,000,000) non-surgical use,

1598177-5

disposable face masks ("Masks") (hereinafter the "Shipment" or "Cargo"), in international air transportation under an Air Waybill ( the "Air Way Bill," "Air Bill" or "Bill").

2. The damages to Plaintiff, in addition to the cost of manufacturing the Masks, was the inability to fulfill a contract for sale with a Vendee ("Vendee") for 500,000 of the 1,000,000 Masks in question, which Vendee cancelled because of the delay, and for a second order of 2,000,000 Masks also cancelled because of the delay of the former; and, for the resulting lost profits from both of those sales, as well Vendee's refusal to do any further business with the Plaintiff as a result of the failure to timely deliver part of the 1,000,000 Mask order.

## THE PARTIES

3. At all times relevant and hereinafter mentioned, Plaintiff, a corporation duly incorporated under the laws of the State of New York, with its principal place of business located at 501 Seventh Avenue, New York, N.Y., is an importer and purveyor of goods, essentially from China, for resale in the United States.

4. Upon information and belief, Defendant Apex is a corporation organized under the laws of the People's Republic of China, with its principal place of business located at 2020 Zhongshan Road (W), 2d Bldg., 6th Floor, Shanghai, PCL, China 20035.

5. Apex also maintains a number of satellite or agency offices in the United States and, particularly, one within the jurisdiction of this Honorable Court at Apex International Logistics (JFK), Inc., 230-59 Rockaway Blvd., Ste. 260, Springfield Gardens, N.Y. 11413, at John F. Kennedy Airport, N.Y. ("JFK"), conducting business as a common carrier and/or bailee of merchandise and providing logistics, freight and shipping services to its customers, and the general public.

1598177-5

6. Upon information and belief, Defendant Aeroflot is a corporation organized pursuant to the laws of the Russia Federation with its corporate headquarters located in Arbat District in Central Administrative Okrug, Moscow, and is an airline which, *inter alia*, does business as a common carrier and/or bailee of merchandise, providing freight and shipping services to its customers, and the general public.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under a treaty of the United States, to wit: the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45 (hereinafter the "Montreal Convention" a successor to, and adjunct of the "Warsaw Convention"), and would have otherwise had jurisdiction over the matter, pursuant to 28 U.S.C. §1332, because this is an action for damages between citizens of diverse states, with the amount in controversy exceeding $75,000, exclusive of interest and costs.

Venue properly lies in this District, pursuant to 28 U.S.C. § 1391, because the Plaintiff resides here, Defendants conduct a substantial part of their United States business in this District and, particularly, within the City of New York, and the damages sustained by the Plaintiff, a resident of New York County, were sustained within this jurisdiction.

## THE BACKGROUND FACTS

8. On April 17, 2020, NFI, pursuant to a Purchase Order, purchased One Million (1,000,000) Masks from Changzhou Leejade Import and Export Co., Ltd, Zhujiang Road, Xinbei China (the "Consignor" or "Changzhou"), a trading company located in the People's Republic of China.

9. On April 24, 2020, the Consignor charged NFI, One Hundred, Forty Thousand ($140,000.00) Dollars for the 1,000,000 Masks, manufactured at 0.14 cents per unit.

1598177-5

10. On April 28, 2020, by wire transfer, NFI paid Apex more than One Hundred, Seventeen Thousand ($117,000.00) Dollars to cover freight charges for Masks purchased from Changzhou.

11. On April 24, 2020, Apex picked up from Changzhou, the One Million (1,000,000) Masks purchased by NFI (the "Consignee") for sale to NFI's Vendee in the United States.

12. The Shipment of the 1,000,000 Masks was supposed to go **directly to New York on April 27, 2020,** to be delivered there **by April 29, 2020** and, on the Consignor's insistence and instructions per the Consignee, carried **on a direct flight** for which the Consignee paid a higher rate of carriage. (**Emphasis provided throughout**)

13. Thereafter, NFI, by truck, would transport the 1,000,000 Masks to the Vendee in Los Angeles which had indicated that it needed the Masks by mid-May for use in conjunction with the Covid-19 epidemic. Trucking usually takes approximately three (3) days.

14. At or about the same time, the Vendee ordered an additional 2,000,000 Masks which it would accept on a less than expedited basis as it expected the first 1,000,000 order by early May, and which NFI would be able to ship by sea at a much lower carry charge since those Masks were not needed on an expedited basis as with the first order.

15. In all, NFI had an agreement with the Vendee for the purchase of 4,000,000 Masks, but due to the Vendee's refusal of the late delivery, only was able to deliver 1,500,000 Masks as a result of the actions and misfeasance of Apex and Aeroflot.

**The 1,000,000 Mask Order**

16. To reiterate, pursuant to a Purchase Order, dated April 24, 2020, NFI purchased 1,000,000 Masks from the Consignor.

17. On the same day, Apex picked up the 1,000,000 Masks for carriage to the United States on behalf of the Consignee, NFI.

18. Apex **did not provide** an Air Bill to the Consignor upon pickup of the Shipment on April 24th but later informed the Consignor that it **might** have to split up the Shipment, without however proffering any reason, or any details or logistics for a split Shipment if that turned out to be the case.

19. The Consignor had no problem with the premise of a split Shipment so long as it was informed as such by Apex were that to occur, and provided that the flights remained direct to New York, and that the Masks arrived within the anticipated next two (2) days after the date of takeoff as Consignor had been made aware by NFI of the expedited need for the Masks.

20. On April 27, 2020, the day the Masks actually were laded on the planes and left China, Apex emailed to the Consignor two Air Bills; one, PVG 999-76297384 (the "First Air Bill") for the Shipment of 500,000 Masks, representing that the Masks were to leave Shanghai Pudong Airport ("Pudong") on China Airlines that day on flight CA1019, providing for direct destination **to JFK Airport as agreed upon,** *ab initio*, **by Apex and the Consignor.**

21. The second Air Bill, PVG 555-26118816 (the "Second Air Bill"), also was for 500,000 Masks shipped from Pudong but, inexplicably, indicated that the cargo was first destined for "SVO" or Sheremetyevo Airport, Moscow, Russia, as the first destination and, in turn, to JFK carried on Aeroflot Flight SU209; **in other words, it was not the direct flight which had been agreed upon by the Consignor and Apex and for which NFI had bargained.**

22. Neither of the Air Waybills were signed by the Carrier and neither represented a complete document; only the first page of a copy of each Bill was emailed to the Consignor.

5

23.     And, neither had the Consignor been apprised of the reason for the split Shipment. This was the first time that the Consignor learned that the Shipment **actually** had been broken up after it was already gone.

24.     While, upon information and belief, Flight SU209 appears to be an international one which travels between Shanghai and Moscow, it also appears not to continue to New York **and, in fact, it did not at least for several weeks.**

25.     The first half of the Masks, on Flight CA1019, arrived in New York on April 29, 2020, as expected and bargained for, two days after having been shipped by the Consignor and, in turn, were timely delivered on behalf of the Consignee, NFI, to its Vendee in Los Angeles.

26.     While Apex shipped half of the Masks **directly to New York**, **as agreed upon with the Consignor**, the second half of the Shipment, without any explanation by Apex to the Consignor or the Consignee, **was diverted to Russia and then, somehow, presumably to New York arriving some 22 days thereafter on May 19, 2020,** upon information and belief, having sat in the Moscow airport for approximately 25 days.

27.     The second part of the Shipment was finally received by Apex (JFK) in mid-May and was so late that by that time NFI's Vendee had looked for, and upon information and belief, found another source of Masks and rejected NFI's attempts to try to ameliorate the situation and accept the late delivery of the 500,000 Masks because, *inter alia*, NFI essentially had no explanation or information to impart to the Vendee as to why the delivery was late because it was kept uninformed by Apex.

28.     The Vendee also refused the additional 2,000,000 Masks which, though not needed as expeditiously as the first 1,000,000, already had been purchased by NFI and shipped by sea from China to Los Angeles where they sit today in a warehouse.

29. To reiterate, while Apex emailed the two unsigned Air Way Bills to the Consignor on the day the Masks left Pudong by air, they were incomplete, *inter alia*, in that the backs of the Bills never were transmitted. And, despite a number of requests, Apex refused to provide either the Consignor or Consignee with the back of either Air Bill.

30. Furthermore, although requested several times from Apex by both Consignor and Consignee, alike, including by counsel for Plaintiff, Apex outright refused to provide a copy of the back of its Air Bill; rather, Apex alluded to Aeroflot's contract of carriage and Air Waybill but which it also has refused to produce.

31. During the ensuing days of the delayed second delivery, conversations between Hui Wang of NFI ("Wang") and Calvin Tseng ("Tseng") of Apex (JFK), engendered by Mr. Wang's inquiries of the whereabouts of the remaining 500,000 Masks, revealed that Wang was being given the runaround; having been told several different versions of why the Shipment had been split, from a problem with "gassing the airplanes," to some "military use" of planes by the Russian government, to overbooking, to problems with the plane in Russia.

32. Neither the Consignor/Shipper nor NFI had ever been informed by Apex, **prior to shipping** the Cargo, that one half of the Shipment would not be on a direct flight to New York as directed, or why, or that it was going through Russia until after the fact; neither was the Consignor offered an option to pay a higher rate for another direct flight for the second part of the Shipment going to Russia if that, under the circumstances, was an unavoidable result, or even retaining another carrier, or choosing another means of carriage. **The Consignor, entitled to be so informed of the logistics of the Shipment before it left China, did not find out about the split Shipment until it was *fait accompli* and half of it was in transit to Russia.**

33.     Despite Apex having contracted Aeroflot as its agent to transport the second half of the Masks, Apex never has proffered any reason why the Shipment obviously sat in the airport in Moscow for more than 20 days despite several requests by NFI for information.

34.     When the second half of the Shipment finally arrived in New York, Apex (JFK) refused to release the goods to NFI until all freight charges for all the Masks shipped by Apex were paid despite that by that time these 500,000 Masks could no longer be sold to the Vendee due to Apex's negligence which had caused NFI to fail to meet its delivery obligations to its Vendee.

35.     Without possession of the Masks, NFI could not even attempt to try to sell the delayed Cargo because by that time the market for Masks needed in the Covid-19 pandemic had attracted hundreds of other suppliers and was beginning to become saturated.

36.     Apex refused to release the Masks until NFI paid another $58,519.89 in freight charges, although Apex had given credit to NFI for that same amount, half of the $117, 513.54 freight charges represented by the earlier wire transfer, **acknowledging the unexplained delay by its misfeasance and negligence and/or that of Aeroflot.**

37.     Plaintiff has lost Seventy Thousand ($70,000.00) Dollars for the costs of manufacturing the 500,000 Masks it could not deliver and which sit at JFK, and Three Hundred, Sixty Thousand ($360,000.00) Dollars for the additional 2,000,000 Masks it could not sell to its Vendee; [1] and it has lost the costs and disbursements for shipping the other 2,000,000 Masks, as well as the profits thereupon which it otherwise would have made on the sale of all the Masks to the Vendee; in total, it has been damaged in excess of One Million, Six Hundred and Fifty Thousand ($1,650,000) Dollars.

---

[1] **The cost of manufacture had by that time increased to .18 cents per unit.**

38. The Defendants, individually and severally, are liable to NFI for the damages sustained by the Plaintiff as occasioned by the delay.

## AS AND FOR A FIRST CAUSE OF ACTION

### (Breach of the Contract of Carriage)

39. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through thirty-eight (38), inclusive, as if fully set forth at length herein.

40. On April 24, 2020, the Consignor, on behalf of the Consignee, NFI, delivered to Apex the 1,000,000 Masks in question, for good and valuable consideration, in good order and condition, and suitable in every respect for the intended transit for which the Defendants received, accepted, and agreed to transport by direct flight to New York so as to be delivered to Consignee in two days.

41. After delivery to Apex, and after Apex already had shipped the Masks, Consignor discovered that Apex had engaged Aeroflot for an improper method of transportation in that the Aeroflot flight was not a direct flight to New York, thereby jeopardizing that the particular portion of the Shipment would actually make it to New York in two days.

42. Despite that Apex had informed Consignor that it might have to split up the Cargo, without proffering a reason therefor, Apex failed to inform the Consignor or Consignee that it actually had split up the Cargo, or the reason it had done so, or how it had shipped that Cargo, until the Cargo had left China; and Apex never informed the Consignor or Consignee as to the details of the carriage until after the fact, nor presented Consignor or Consignee with an alternative way to ship the Cargo knowing that it was not on a direct flight to New York as they had made known to, and agreed upon with Apex.

43. The result of the breach by Apex was that 500,000 of the 1,000,000 Masks were rendered useless to Consignee because of the Vendee's refusal to accept late delivery; in addition, the ensuing damages to NFI occasioned by the delay.

44. Defendants breached, failed, and violated the contract of carriage and their duties as common carrier and bailees.

45. By reason therefor, NFI has sustained damages in the amount of approximately $330,000.00 for the 500,000 Masks, as well as for all the monies lost on the 2,000,000 Masks which the Vendee also refused because of the delay, including the costs of manufacture; in total, another $1,320,000.00, or as near as can be estimated, which Defendant Apex has refused to pay the Plaintiff, and for which NFI should have judgment over and against the Defendants, together with the costs and disbursements of this action.

## AS AND FOR A SECOND CAUSE OF ACTION

(**Breach of Bailment by Both Defendants**)

46. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through forty-five (45), inclusive, as if fully set forth at length herein.

47. Both Defendants were serving as bailees of the Shipment at the time it was accepted in turn by each and as delayed in its delivery, and whether one was acting as agent for the other, or acting independently, each had a legal duty and obligation to deliver the Shipment timely in good order and to perform their services as a bailee in a proper and workmanlike manner in accordance with the contract of carriage.

48. Defendants, either on their own, or by retaining the other, breached their obligations to Apex to deliver the Cargo timely and in good condition.

49. By failing to do so, the Defendants rendered the bailment valueless and thereby damaged the Plaintiff by reason of the fact that Plaintiff could not fulfill its obligation to its Vendee.

50. By reason therefor, NFI is entitled to judgement over and against Defendants in the amount of the damages sustained by NFI for its inability to fulfill its agreement with the Vendee, approximately One Million Six Hundred and Fifty ($1,650,000) Dollars, together with the costs and disbursements incurred herein.

### AS AND FOR A THIRD CAUSE OF ACTION

**(Negligence of Both Defendants)**

51. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through fifty (50), inclusive, as if fully set forth at length herein.

52. Defendants had an obligation to follow the tenets and directives of transportation for the Shipment of the Cargo in accordance with the Montreal Convention to which the countries in which both Defendants are incorporated are signatories.

53. Both Defendants were negligent in following those directives, *inter alia,* in informing the Consignor and Consignee that the Shipment actually was being broken up; informing Consignor/Consignee that the second Shipment was going through Russia and was not on a direct flight to New York; failing to give the Consignor/Consignee an opportunity to choose an alternative contract of carriage if it did not want part of the Shipment to go through Russia and/or not on an indirect flight.

54. By failing to do so, Apex caused a delay in the Shipment of the Cargo and the ensuing damages sustained by NFI.

55. By reason therefor, NFI is entitled to judgement over and against Defendants in the amount of the damages sustained by NFI for the manufacture of the 500,000 Masks, as well as for the damages occasioned by the delay and its subsequent inability to fulfill its agreement with the Vendee which rejected the additional 2,000,000 Masks, in total approximately $1,650,000.00, together with the costs and disbursements incurred herein.

**WHEREFORE,** Plaintiff respectfully requests judgment over and against the named Defendants as follows:

a) On the First Cause of Action in the amount of $1,650,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

b) On the Second Cause of Action in the amount of $1,650,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

c) On the Third Cause of Action in the amount of $1,650,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

d) Together with such other and additional relief which under the premises the Court deems just and proper.

June 22, 2020
New York, N.Y.

LOUIS J. MAIONE, P.C.

By: *Louis J. Maione*
Louis J. Maione, Esq. (8589)
303 East 57th Street, 30th Fl.
New York, N.Y. 10022
(917) 549-5693
Attorney for Plaintiff

1598177-5