**Law Offices of Louis J. Maione, Esq. (8589)**
**303 East 57th Street, 30th Floor**
**New York, N.Y. 10022**
**(917) 549-5693**
**Attorney for Plaintiff**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| New Fortune, Inc.,<br><br>Plaintiff,<br><br>-against-<br><br>Apex Logistics International (CN) Ltd., and Aeroflot Airlines,<br><br>Defendants. | 20 Civ. 04883<br><br>**AMENDED COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff, New Fortune, Inc. ("Plaintiff", "NFI" or "New Fortune"), by and through its attorney, Louis J. Maione, Esq., for its Complaint against the defendants, Apex Logistics International (CN) Ltd., ("Apex" or "Defendant"), and Aeroflot Airlines ("Aeroflot" or "Defendant") (collectively, the "Defendants") alleges herein, either upon personal knowledge or upon information and belief, as follows:

## INTRODUCTION

1. This is an action, *inter alia*, based on the negligence, breach of contract and breach of bailment of the Defendants to timely ship from China and deliver in New York, in good order, Plaintiff's purchase of One Million (1,000,000) non-surgical use, disposable face

masks ("Masks") (hereinafter the "Shipment" or "Cargo"), in international air transportation pursuant to one or more Air Waybills ( the "Air Way Bill," "Air Bill" or "Bill").

2. The damages to Plaintiff, in addition to the cost of manufacturing the Masks, is the lost profits attributable to the inability to fulfill a contract for sale with a Vendee ("Vendee") for 500,000 of the 1,000,000 Masks in question, which Vendee cancelled specifically because of the inordinate delay, and for a second order of 2,000,000 Masks also cancelled by that Vendee because of the delay of the earlier Shipment; and, for the resulting lost profits from both of those sales, as well as due to Vendee's refusal to do any further business with the Plaintiff as a result of the failure to timely deliver part of the 1,000,000 Mask order.

**THE PARTIES**

3. At all times relevant and hereinafter mentioned, Plaintiff, a corporation duly incorporated under the laws of the State of New York, with its principal place of business located at 501 Seventh Avenue, New York, N.Y., is an importer and purveyor of goods, essentially from China, for resale in the United States.

4. Upon information and belief, Defendant Apex is a corporation organized under the laws of the People's Republic of China, with its principal place of business located at 2020 Zhongshan Road (W), 2d Bldg., 6th Floor, Shanghai, PCL, China 20035 and, upon information and belief, holds itself out and operates as a freight forwarder.

5. In addition to its organization in China, Apex also maintains a number of satellite or agency offices in the United States; particularly one within the jurisdiction of this Honorable Court at Apex International Logistics (JFK), Inc., 230-59 Rockaway Blvd., Ste. 260, Springfield Gardens, N.Y. 11413, at John F. Kennedy Airport, N.Y. ("JFK"), conducting business as a

common carrier and/or bailee of merchandise and providing logistics, freight forwarding and shipping services to its customers, and the general public.

6. Another Apex office is located in Rancho Dominguez, California and, as a matter of fact, Apex billed the Plaintiff for the Shipments in question on the California invoice.

7. Upon information and belief, Defendant Aeroflot is a corporation organized pursuant to the laws of the Russia Federation with its corporate headquarters located in Arbat District in Central Administrative Okrug, Moscow, and is an airline which, *inter alia*, does business as a common carrier and/or bailee of merchandise, providing freight and shipping services to its customers, and the general public.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars and all Defendants are citizens of states other than that of the Plaintiff thereby establishing diversity jurisdiction.

9. Even if it were determined by this Court that Plaintiff's claims were to have arisen under a treaty of the United States, to wit: the Convention for the Unification of Certain Rules for International Carriage by Air, May 28, 1999, S. Treaty Doc. No. 106-45 (hereinafter the "Montreal Convention" a successor to, and adjunct of the "Warsaw Convention"), this Court would have jurisdiction over the matter.

Venue properly lies in this District, pursuant to 28 U.S.C. § 1391, because the Plaintiff resides here, and Defendants conduct a substantial part of their United States business in this District and, particularly, within the City of New York; and the damages

sustained by the Plaintiff, a resident of New York County, were sustained within this jurisdiction.

**THE BACKGROUND FACTS**

10. On April 17, 2020, pursuant to a Purchase Order, NFI purchased One Million (1,000,000) Masks from Changzhou Leejade Import and Export Co., Ltd, Zhujiang Road, Xinbei China (the "Consignor" or "Changzhou"), a trading company located in the People's Republic of China.

11. On April 24, 2020, the Consignor charged NFI, One Hundred, Forty Thousand ($140,000.00) Dollars for the 1,000,000 Masks, manufactured at 0.14 cents per unit.

12. On April 28, 20 20, by wire transfer, NFI paid Apex more than One Hundred, Seventeen Thousand ($117,000.00) Dollars to cover freight charges for the Masks purchased from Changzhou.

13. On April 24, 2020, Apex picked up from Changzhou, the One Million (1,000,000) Masks purchased by Plaintiff (also referred to throughout as the "Consignee") for sale to NFI's Vendee in the United States.

14. Per the directions of the Consignor to Apex, the Shipment of the 1,000,000 Masks was supposed to go by **direct flight to New York on April 27, 2020,** to be delivered there within two days, or **by April 29, 2020;** on the Consignor's insistence and instructions per the Consignee, the Masks were to be carried **on a direct flight** for which the Consignee paid a higher rate of carriage. (**Emphasis provided throughout**)

15. Thereafter, NFI, by truck, would transport the 1,000,000 Masks to the Vendee in Los Angeles which had indicated that it needed the Masks by mid-May for use in conjunction with the Covid-19 epidemic. Cross-country trucking usually takes approximately three (3) days.

16. At or about the same time, the Vendee ordered an additional 2,000,000 Masks which it agreed to accept on a less than expedited basis as it expected the first 1,000,000 order by early May. NFI would be able to ship that larger second Shipment by sea at a much lower carry charge since those Masks were not needed on an expedited basis as with the first order. The result would be greater profits.

17. In all, NFI had an agreement with the Vendee for the purchase of 4,000,000 Masks, but due to the Vendee's refusal of the late delivery, NFI only was able to deliver 1,500,000 Masks as a result of the actions, negligence and misfeasance of Apex and Aeroflot.

**The 1,000,000 Mask Order**

18. To reiterate, pursuant to a Purchase Order, dated April 24, 2020, NFI purchased 1,000,000 Masks from the Consignor.

19. On the same day, by truck Apex picked up the 1,000,000 Masks for carriage to the United States on behalf of the Consignee, NFI.

20. Upon information and belief, the crates in which the Masks were packaged all were sound and secured after being picked up by Apex and the Masks all in good order.

21. Apex **did not provide** an Air Bill to the Consignor upon pickup of the Shipment on April 24th but later informed the Consignor that it **might** have to split up the Shipment, without however proffering any reason, any details as to the proportionality of the split Shipment, or any logistics in respect of the split Shipment if that turned out to be the case; or which carrier or carriers it would select to transport the Cargo.

22. The Consignor had no problem with the premise of a split Shipment so long as it was informed timely as such by Apex were that to occur, and provided that the flights were

direct to New York, with the Masks arriving within the next two (2) days after the date of takeoff as Consignor had been made aware by NFI of the expedited need for the Masks.

23. Consignor's employee reiterated the aforementioned explicit instructions to the Apex representative, especially of direct flights to New York, and the need for the Masks to arrive in two days.

24. On April 27, 2020, the day the Masks actually were laded on the planes and left China. The freight forwarder selected two carriers to transport the Shipments and thereafter emailed to the Consignor two Air Bills; one, PVG 999-76297384 (the "First Air Bill") for the Shipment of 500,000 Masks, which represented that number of Masks were to leave Shanghai Pudong Airport ("Pudong") on China Airlines that day on flight CA1019, providing for direct destination **to JFK Airport as agreed upon, *ab initio*, by Apex and the Consignor.**

25. The second Air Bill, PVG 555-26118816 (the "Second Air Bill"), also was for 500,000 Masks shipped from Pudong but, inexplicably, indicated that the cargo was first destined for "SVO" or Sheremetyevo Airport, Moscow, Russia, as its first destination and, in turn, to JFK carried on Aeroflot Flight SU 209; **in other words, it was not the direct flight which had been agreed upon by the Consignor and Apex and for which NFI had bargained.**

26. Neither of the Air Waybills were signed either by the issuing Carrier or their agent, Apex, and neither represented a complete document; only the first page of a copy of each Bill was emailed to the Consignor. Both were deficient in respect of the information required to be part of the Air Bill.

27. Neither had the Consignor been apprised of the reason for the split Shipment. This was the first time that the Consignor learned that the Shipment **actually** had been broken up but only **after the Shipment was already airborne.**

28. While, upon information and belief, Flight SU 209 appears to be an international one which travels between Shanghai and Moscow, it also appears not to continue to New York **and, in fact, it did not leave for New York for at least several weeks.**

29. The first half of the Shipment, carried on Flight CA 1019, arrived in New York on April 29, 2020, as expected, bargained for, and agreed to between Consignor and Apex, two days after having been shipped by the Consignor. In turn, after pick-up by NFI the Masks timely were delivered on behalf of the Consignee to its Vendee in Los Angeles.

30. While Apex shipped half of the Masks **directly to New York**, **as agreed upon with the Consignor**, the second half of the Shipment, without any explanation by Apex to the Consignor or the Consignee, **was diverted to Russia and then, somehow, presumably to New York arriving on May 19, 2020, some 22 days thereafter after it was supposed to arrive,** upon information and belief having sat in the Moscow airport for approximately 25 days.

31. The second part of the Shipment was finally received by Apex (JFK) in mid-May and was so late that by that time NFI's Vendee had looked for, and upon information and belief, found another source of Masks rejecting NFI's attempts to try to ameliorate the situation or to persuade the Vendee to accept a late delivery. *Inter alia*, because NFI essentially had no explanation or information to impart to the Vendee as to why the delivery was late, because it had been affirmatively kept uninformed by Apex, it could not persuade its Vendee to accept the Shipment.

32. In addition, upon information and belief, at least six (6) crates of Masks in the Aeroflot Shipment were damaged. Further upon information and belief, the Masks were crated by Apex.

33. The Vendee also refused the additional 2,000,000 Masks which, though not needed as expeditiously as the first 1,000,000, already had been purchased by NFI and shipped by sea from China to Los Angeles where they sit today in a warehouse.

34. To reiterate, while Apex emailed the two unsigned and patently deficient Air Way Bills to the Consignor on the day the Masks left Pudong by air, they were incomplete, *inter alia*, in that the backs of the Bills never were transmitted either to the Consignor or the Consignee and the Bills neither signed by the freight forwarder, the carrier, or an agent on behalf of either. And, despite a number of requests prior to the inception of this matter Apex refused to provide either the Consignor or Consignee with the back of either Air Bill.

35. Furthermore, although requested several times from Apex by both Consignor and Consignee, alike, including by counsel for Plaintiff, Apex outright refused to provide a copy of the back of its Air Bill; rather, Apex alluded to Aeroflot's contract of carriage and Air Waybill but which it also refused to produce.

36. During the ensuing days of the delayed second delivery, conversations between Hui Wang of NFI ("Wang") and Calvin Tseng ("Tseng") of Apex (JFK), engendered by Mr. Wang's inquiries of the whereabouts of the remaining 500,000 Masks, revealed that Wang was being given the runaround; having been told several different versions of why the Shipment had been split, from a problem with "gassing the airplanes," to some "military use" of planes by the Russian government, to overbooking, to problems with the plane in Russia, to getting the Masks

too late to be consigned to the Air China flight. Tseng said nothing about the damaged crates, or where the damage had occurred.

37. Neither the Consignor/Shipper nor NFI had ever been informed by Apex, **prior to shipping** the Cargo, that one half of the Shipment would not be on a direct flight to New York as directed, or why, or that it was going through Russia until after the fact; neither was the Consignor offered an option to pay a higher rate for another direct flight for the second part of the Shipment going to Russia if that, under the circumstances, was an unavoidable result, or even the necessity to retain another carrier, or choosing another means of carriage. **The Consignor, entitled to be so informed of the logistics of the Shipment before it left China, did not find out about the split Shipment until it was *fait accompli* and half of it was either was in transit to Russia, or already there.**

38. Despite Apex having contracted Aeroflot to transport the second half of the Mask Shipment, Apex never has proffered any reason why the Shipment obviously sat in the airport in Moscow for more than 20 days despite several requests by NFI for information, or when Apex knew that it was delayed.

39. When the second half of the Shipment finally arrived in New York, Apex (JFK) refused to release the goods to NFI until all freight charges for all the Masks shipped by Apex were paid despite that by that time these 500,000 Masks could no longer be sold to the Vendee due to Apex's negligence which had caused NFI to fail to meet its delivery obligations to its Vendee.

40. Without possession of the Masks, NFI could not even attempt to try to sell the delayed Cargo because by that time the market for Masks needed in the Covid-19 pandemic had attracted hundreds, if not thousands, of other suppliers and was beginning to become saturated.

41. Apex refused to release the Masks until NFI paid another $58,519.89 in freight charges, although Apex then gave credit to NFI for that same amount, half of the $117, 513.54 freight charges represented by the earlier wire transfer, **acknowledging that the credit was due to the unexplained delay by its misfeasance and negligence, and/or that of Aeroflot.**

42. Plaintiff has lost Seventy Thousand ($70,000.00) Dollars for the costs of manufacturing the 500,000 Masks it could not deliver and which sit at JFK, and Three Hundred, Sixty Thousand ($360,000.00) Dollars for the additional 2,000,000 Masks it could not sell to its Vendee; [1] and it has lost the costs and disbursements for shipping the other 2,000,000 Masks, as well as the profits thereupon which it otherwise would have made on the sale of all the Masks to the Vendee; in total, it has been damaged in excess of One Million, Six Hundred and Fifty Thousand ($1,650,000) Dollars.

43. The Defendants, individually and severally, are liable to NFI for the damages sustained by the Plaintiff as occasioned by the delay.

**AS AND FOR A FIRST CAUSE OF ACTION**

**(Breach of the Contract of Carriage)**

44. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through forty three (43), inclusive, as if fully set forth at length herein.

45. On April 24, 2020, the Consignor, on behalf of the Consignee, NFI, delivered to Apex the 1,000,000 Masks in question, for good and valuable consideration, in good order and condition, and suitable in every respect for the intended transit for which the Defendants received, accepted, and agreed to transport by direct flight to New York so as to be delivered to Consignee in two days.

[1] **The cost of manufacture had by that time increased to .18 cents per unit.**

46. After delivery to Apex, and after Apex already had shipped the Masks, Consignor discovered that Apex had engaged Aeroflot for an improper method of transportation in that the Aeroflot flight was not a direct flight to New York, thereby jeopardizing that the particular portion of the Shipment would actually make it to New York in two days.

47. Despite that Apex had informed Consignor that it might have to split up the Cargo, without proffering a reason therefor, Apex failed to inform the Consignor or Consignee that it actually had split up the Cargo, or the reason it had done so, or how it had shipped that Cargo, until the Cargo had left China; and Apex never informed the Consignor or Consignee as to the details of the carriage until after the fact, nor presented Consignor or Consignee with an alternative way to ship the Cargo knowing that it was not on a direct flight to New York as they had made known to, and agreed upon with Apex.

48. The result of the breach by Apex was that 500,000 of the 1,000,000 Masks were rendered useless to Consignee because of the Vendee's refusal to accept late delivery; in addition, the ensuing damages to NFI occasioned by the delay. The delay in fact resulted in the entire 500,000 Shipment useless insofar as it was not delivered on time, nor would it have been in good order since at least 6 crates, if not more, were damaged; i.e., it was an incomplete delivery.

49. Defendants breached, failed, and violated the contract of carriage and their duties as common carrier and bailees.

50. By reason therefor, NFI has sustained damages in the amount of approximately $330,000.00 for the 500,000 Masks, as well as for all the monies lost on the 2,000,000 Masks which the Vendee also refused because of the delay, including the costs of manufacture; in total, another $1,320,000.00, or as near as can be estimated, which Defendant Apex has refused to

pay the Plaintiff, and for which NFI should have judgment over and against the Defendants, together with the costs and disbursements of this action.

**AS AND FOR A SECOND CAUSE OF ACTION**

(**Breach of Bailment by Both Defendants**)

51. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through fifty (50), inclusive, as if fully set forth at length herein.

52. Both Defendants, at some point in the carriage of the masks, were serving as bailees of the Shipment both at the time it was accepted in turn by each and at the time it was delayed in its delivery. And, whether one Defendant was acting as agent for the other, or acting independently, each had a legal duty and obligation to deliver the Shipment timely and in good order and to perform their services as a bailee in a proper and workmanlike manner in accordance with their respective contracts.

53. Defendants, either on their own, or by retaining the other, breached their obligations to Plaintiff to deliver the Cargo timely, complete, and in good condition.

54. By failing to do so, the Defendants rendered the bailment valueless and thereby damaged the Plaintiff by reason of the fact that Plaintiff could not fulfill its obligation to its Vendee.

55. By reason therefor, NFI is entitled to judgement over and against Defendants in the amount of the damages sustained by NFI for its inability to fulfill its agreement with the Vendee, approximately One Million Six Hundred and Fifty ($1,650,000) Dollars, together with the costs and disbursements incurred herein.

**AS AND FOR A THIRD CAUSE OF ACTION**

**(Negligence of Both Defendants)**

56. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through fifty five (55), inclusive, as if fully set forth at length herein.

57. Defendants, if they believed their actions were governed by the Montreal Convention, had an obligation to follow the tenets and directives of transportation for the Shipment of the Cargo in accordance therewith.

58. Both Defendants were negligent in following those directives, *inter alia*, Apex in failing to timely inform the Consignor and Consignee that the Shipment actually was being broken up; in failing to inform Consignor/Consignee that the second Shipment was going through Russia and was not on a direct flight to New York; and in failing to give the Consignor/Consignee an opportunity to choose an alternative contract of carriage if it did not want part of the Shipment to go through Russia and/or on an indirect flight.

59. The Defendants by damaging the crates and thereby rendering the Shipment valueless and/or by failing to fly the Shipment to New York for almost 23 days thereby further rendering the Shipment of no value.

60. By their actions, either individually or together, Defendants caused a delay in the Shipment of the Cargo, rendering the entire Shipment of no value, and causing the ensuing damages sustained by NFI.

61. By reason therefor, NFI is entitled to judgement over and against Defendants in the amount of the damages sustained by NFI for the manufacture of the 500,000 Masks, as well as for the damages occasioned by the delay and its subsequent inability to fulfill its agreement with the Vendee which rejected the additional 2,000,000 Masks, in total approximately $1,650,000.00, together with the costs and disbursements incurred herein.

**AS AND FOR A FOURTH CAUSE OF ACTION**

**(Negligence of Defendant Apex)**

62. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through sixty one (61), inclusive, as if fully set forth at length herein.

63. Defendant Apex was aware that the Shipment needed to be delivered to New York by direct flight and within approximately two days as evidenced by the Air Bills completed by Apex after discussions with the Consignor.

64. Defendant Apex, as everyone in the midst of the worst pandemic in one hundred years, was further aware that the Shipment was comprised of Masks to be used by the general public and that it was foreseeable that a failure to deliver in two to three days could affect the Consignee's business.

65. As a bailee, Defendant had an obligation to both the Consignor and the Consignee to not only impart information to Aeroflot, to wit: that the Shipment needed to be on a direct flight to New York and must arrive within two days, but an obligation to communicate with Aeroflot when Apex became aware that the Shipment was sitting in Moscow to rectify the situation.

66. Up on information and belief, Apex negligently failed to relay that information to Aeroflot, the result of which was that Aeroflot for some inexplicable reason sat on the Shipment for more than approximately 20 days, thereby rendering the Shipment completely valueless since the Masks were needed expeditiously.

67. And, whether or not Aeroflot damaged the six crates in question or Apex damaged them, or they were damaged in transit, the delay of a Shipment in good and sound order was the proximate and direct cause of the refusal of the Plaintiff's Vendee to accept the Shipment when it finally arrived, thereby causing the Plaintiff the damages sustained herein.

68. Conversely, if Apex did notify Aeroflot of the need to expedite delivery, Apex, as bailee, was negligent in failing to retrieve the Shipment from Aeroflot in order to have the delivery made on time once it learned from Plaintiff that the Shipment had not arrived.

69. At least as to this Shipment, Apex is indebted to Plaintiff for the cost of production of the Masks, as well as the lost profits and the freight charges, a total of approximately $280,000.00, together with legal fees and costs.

70. By reason therefor, NFI is entitled to judgement over and against Apex in the amount of the damages sustained for the manufacture of the 500,000 Masks, as well as for the damages occasioned by the delay and its subsequent inability to fulfill its agreement with the Vendee for this part of the Shipment in the amount of approximately $ 285,000.00, together with the costs and disbursements incurred herein.

**AS AND FOR A FIFTH CAUSE OF ACTION**

**(Estoppel)**

71. Plaintiff incorporates by reference herein each and every allegation propounded hereunder in paragraphs one (1) through seventy (70), inclusive, as if fully set forth at length herein.

72. Apex filled out both Air Bills and provided them to the Consignor albeit after the Shipments were in transit.

73. Both Air Bills provided that the Masks arrive in New York in two days on direct flights, although Apex, as bailee, failed to carry out the bailment as agreed by placing the second part of the Shipment with Aeroflot which failed to deliver the Masks timely.

74. Both Consignor and Consignee relied on the information imparted to them when Apex ultimately provided the unsigned Air Bills to the Consignor.

75. Had either the Consignor or Consignee been made aware that the Masks in the possession of Aeroflot would not be delivered for weeks, it could have taken action to ship another 500,000 Masks to New York by securing them from the manufacturer.

76. In reliance on the initial misinformation and promise provided to them by Apex that the Shipments would go on direct flights to New York and be delivered in two days, neither Consignor nor Consignee took any action which would have otherwise ameliorated the impending delay had they been made aware.

77. By reason therefor, Apex is equitably estopped from denying that it promised to fulfill what it had represented to the Consignor and Consignee that the entire Shipment would be in New York in two days, or for causing NFI to rely on that promise to its detriment.

78. By reason therefor, NFI is entitled to judgement over and against Apex in the amount of the damages sustained by reason of the promises upon which Plaintiff relied, together with the costs and disbursements incurred herein.

**WHEREFORE,** Plaintiff respectfully requests judgment over and against the named Defendants as follows:

a) On the First Cause of Action in the amount of $1,650,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

b) On the Second Cause of Action in the amount of $1,650,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

c) On the Third Cause of Action in the amount of $1,650,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

d) On the Fourth Cause of Action in the amount of $285,000, together with interest accrued thereon, as well as the costs and disbursements of this action;

e) On the Fifth Cause of Action in the amount of the damages sustained by Plaintiff, together with interest accrued thereon, as well as the costs and disbursements of this action;

f) Together with such other and additional relief which under the premises the Court deems just and proper.

October 2, 2020
New York, N.Y.

LOUIS J. MAIONE, P.C.

By: *Louis J. Maione*
Louis J. Maione, Esq. (8589)
303 East 57th Street, 30th Fl.
New York, N.Y. 10022
(917) 549-5693
Attorney for Plaintiff