**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

New Fortune, Inc.,

                  Plaintiff,

       -against-

Apex Logistics International (CN) Ltd., and
Aeroflot Airlines,

                 Defendants.

20 Civ. 04883

**MEMORANDUM OF LAW OF NEW FORTUNE, INC. IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**Law Offices of Louis J. Maione, Esq. (8589)**
**303 East 57th Street, 30th Floor**
**New York, N.Y. 10022**
**(917) 549-5693**
**Attorney for Plaintiff**

## TABLE OF CONTENTS

**Page**

TABLE OF CASES ..................................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

THE BACKGROUND FACTS ..................................................................................................1

LEGAL STANDARD FOR DISMISSAL ................................................................................8

    **Motion to Dismiss** ...........................................................................................................8

    **Montreal Convention Does Not Apply Here** .................................................................9

    **Article 19 Does Not Afford an Affirmative Defense to Defendants** .............................10

    **Article 18 of the Convention** .......................................................................................14

    **Incomplete Air Bills** ....................................................................................................15

    **Evidence of Contract** ...................................................................................................15

CONCLUSION .........................................................................................................................18

**TABLE OF CASES**

**Page**

Ashcroft v. Iqbal,
 556 U.S. 662 (2009)................................................................................................... 7

Bell Atlantic Corp. v. Twombly,
 550 U.S. 544 (2007)................................................................................................... 7

Branch v. Tunnell,
 14 F.3d 449 (9th Cir.1994) ...................................................................................... 18

Calcutti v. SBU, Inc.
 , 273 F. Supp. 2d 488 (S.D.N.Y. 2003).................................................................... 17

Chambers v. Time Warner, Inc.,
 282 F.3d 147 (2d Cir. 2002)..................................................................................... 17

Chan v. Korean Air Lines,
 490 U.S. 122, 109 S.Ct. 1676 (1989)....................................................................... 16

Cocca Rau v. Standard Ins. Co.,
 (S.D.N.Y. 2020; 19-cv-6149) ..................................................................................... 8

Coggins v. Buonora,
 776 F.3d 108 (2d Cir. 2015)..................................................................................... 16

Coggins v. County of Nassau,
 988 F. Supp. 2d 231 (E.D.N.Y. 2013) ..................................................................... 16

Compare Rocha v. American Jets, Inc.,
 2014 WL 12626317, at *3 (S.D. Fla. Nov. 17, 2014).............................................. 9

Di Folco v. MSNBC Cable L.L.C.,
 622 F.3d 104 (2d Cir. 2010)....................................................................................... 8

Galbraith v. County of Santa Clara,
 307 F.3d 1119 (9th Cir.2002) .................................................................................. 18

Harlow v. Fitzgerald,
 457 U.S. 800, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)............................................ 8

Irabor v. Lufthansa,
 (D. Mass. 2019, 19-cv-12087-FDS) ........................................................................ 11

Jensen v. Virgin Atl.,
 2013 WL 1207962, at *3 (N.D. Cal. Mar. 25, 2013)................................................. 9

Kamanou-Goune v. Swiss Int'l Airlines,
    2009 WL 874600, at *4 (S.D.N.Y. Mar. 27, 2009) .............................................................. 11

Leeds v. Meltz,
    85 F.3d 51 (2d Cir. 1996).................................................................................................... 8

Nankin v. Continental Airlines, Inc.,
    2010 WL 342632, at *6-8 (C.D. Cal. Jan. 29, 2010) ......................................................... 12

Narkiewicz-Laine v. Scandinavian Airlines Sys.,
    587 F. Supp. 2d 888 (N.D. Ill. 2008) ................................................................................... 9

Parrino v. FHP Inc.,
    146 F.3d 699 (9th Cir. 1998) .............................................................................................. 18

Polanco v. NCO Portfolio Mgmt., Inc.,
    23 F. Supp. 3d 363 (S.D.N.Y. 2014).................................................................................. 17

Scheuer v. Rhodes,
    416 U.S. 232, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974) .......................................................... 8

Schoeffler-Miller v. Northwest Airlines, Inc.,
    2008 WL 4936737, at *3 (C.D. Ill. Nov. 17, 2008)............................................................ 10

Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.,
    522 F.3d 776 (7th Cir. 2008) .............................................................................................. 10

Tata AIG Gen. Ins. Co; v. British Airways,
    2013 U.S. Dist. LEXIS 89830 *34-37 ................................................................................ 14

Van Buskirk v. CNN,
    284 F.3d 977 (9th Cir. 2002) .............................................................................................. 17

Venture Assoc. Corp. v. Zenith Data Systems Corp.,
    987 F.2d 429 (7th Cir.1993) ............................................................................................... 18

Victoria Sales v. Emery Air Freight,
    917 F. 2d 705 (2d Cir. 1990).............................................................................................. 14

Weiss v. El Al,
    433 F. Supp. 2d 361 (S.D.N.Y. 2006)................................................................................. 12

Wolgel v. Mexicana Airlines,
    821 F.2d 442  (7th Cir. 1987) ............................................................................................ 12

Zatta v. Societe Air France,
    2011 WL 2472280, at *2-3 (C.D. Cal. June 21, 2011)......................................................... 9

**PRELIMINARY STATEMENT**

Plaintiff, New Fortune, Inc. ("NFI" or "Plaintiff"), by and through its counsel, Louis J. Maione, Esq., submits this Memorandum of Law in opposition to the Motion to Dismiss Plaintiff's state law claims by Defendants, Apex Logistics International (CN), Ltd. ("Apex") and Aeroflot Airlines ("Aeroflot"), premised on the Memorandum of Law submitted by the attorneys for both defendants ("Defendants"). For purposes of a Motion to Dismiss a Complaint, it is axiomatic that the following facts, which were lifted from Plaintiff's Amended Complaint (the "Complaint"), must be deemed by the Court to be true, and that all reasonable inferences must be drawn in Plaintiff's favor.

**THE BACKGROUND FACTS**

On April 17, 2020, pursuant to a Purchase Order, NFI purchased One Million (1,000,000) disposable, non-surgical, protective Masks from Changzhou Leejade Import and Export Co., Ltd, Xinbei China (the "Consignor"). On April 24, 2020, the Consignor charged NFI, One Hundred, Forty Thousand ($140,000.00) Dollars for the 1,000,000 Masks, manufactured at 0.14 cents per unit.

On April 28, 2020, by wire transfer, NFI paid Apex more than One Hundred, Seventeen Thousand ($117,000.00) Dollars to cover freight charges for the Masks purchased from Consignor, after Apex had picked up the One Million (1,000,000) Masks on April 24, 2020. The Masks were intended for NFI's Vendee ("Vendee") in Los Angeles.

Per the directions of the Consignor to Apex, made on behalf of the Plaintiff (here also the "Consignee"), the Shipment of the 1,000,000 Masks was supposed to go by **direct flight to New York on April 27, 2020,** to be delivered there within two days, or **by April 29, 2020 (emphasis hereinafter provided);** on the Consignor's insistence and per instructions of the Consignee, the

1

Masks were to be carried only **by direct flight** for which the Consignee paid a higher rate of carriage. Thereafter, NFI, by truck, would transport the 1,000,000 Masks to its Vendee which had indicated an urgent need for the Masks no later than early to mid-May at the latest for use in conjunction with the Covid-19 epidemic. **[1]**

At or about the same time, NFI's Vendee ordered an additional 2,000,000 Masks which it agreed to accept on a less than expedited basis as it expected the first 1,000,000 order by early May. NFI would be able to ship that larger second Shipment by sea at a much lower carry charge since those Masks were not needed as expeditiously as the first order. In all, NFI had an agreement with its Vendee for the purchase of 4,000,000 Masks, but due to the Vendee's refusal of the late delivery, NFI only was able to deliver 1,500,000 Masks as a result of the actions, negligence and misfeasance of Apex and Aeroflot.

On April 24, 2020, the same day NFI purchased the 1,000,000 Masks from the Consignor, Apex picked up, **and crated** the 1,000,000 Masks for carriage to the United States. **[2]**

Apex **did not provide** an Air Bill to the Consignor upon pickup of the Shipment on April 24th but later informed the Consignor that it **might** have to split the Shipment without, however, proffering any reason, any details as to the proportionality of a split Shipment, or any logistics in respect of the split Shipment if that turned out to be the case; neither did Apex disclose which carrier or carriers it had, or would select to transport the Cargo ("Cargo"). The Consignor had no

---

**[1]** The contract calling for a two day delivery was of grave importance to NFI and predicated on the need for these Masks by its Vendee as the country was in the early throes of the Covid-19 pandemic. Shipping by sea for example would be cheaper but of no consequence; its customer wanted the Masks *tout de suite*.

**[2]** It is unknown where the Masks were crated by Apex or exactly when other than Apex did the crating; e.g., likely at a drop or warehouse outside the airport before being transported to Pudong Airport in Shanghai because Apex had the Masks **in its custody and control for three (3) days prior to lading**. Xinbei, China is 222 kilometers from Pudong and over a 2 and ½ hour trip by truck. Presuming that these Cargo planes leave every day on schedule, the Masks were not in airborne transit for three (3) days after their pick-up in Xinbei and no air carriage had begun. If they were damaged by Apex in the three days between pick-up and lading they were damaged outside of the confines of the airport and not in airborne transit. Lading damaged goods on a plane would not *ipso facto* deem the crates to have been damaged in a contract for air transportation.

problem with a split Shipment so long as it was informed timely as such by Apex if that were to occur, **and provided that as agreed** the flights **were direct to New York,** with the Masks arriving within the next two (2) days after the date of takeoff as Consignor had been made aware by NFI of the expedited need for the Masks.

Consignor's employee reiterated the aforementioned explicit instructions to the Apex representative, especially of the required direct flights to New York, **and the need for the Masks to arrive in two days.**

On April 27, 2020, the day the Masks actually were laded on the two planes by Apex and left China, the freight forwarder selected two different carriers to transport the Shipments and thereafter emailed to the Consignor two Apex Air Bills; one, PVG 999-76297384 (the "First Air Bill") for the Shipment of 500,000 Masks, which represented that number were to leave Shanghai Pudong Airport ("Pudong") on China Airlines that day on flight CA 1019, **providing for direct destination to JFK Airport as agreed upon,** *ab initio*, **by Apex and the Consignor.** The second Air Bill, PVG 555-26118816 (the "Second Air Bill"), also was for 500,000 Masks shipped from Pudong but, inexplicably, indicated that the Cargo was first destined for "SVO" or Sheremetyevo Airport, Moscow, Russia, as its first destination and, in turn, to JFK carried on Aeroflot Flight SU 209; **in other words, it was not the direct flight which had been agreed upon by the Consignor and Apex, and for which NFI had bargained, and what occurred contravened the information on the Apex invoices ("Invoices") to Plaintiff, dated April 26, 2020, confirming arrival in two days**. The Apex Invoice for the Aeroflot flight, an Apex document, actually provides that the **Shipment was to be delivered to JFK Airport in New York on April 28, 2020, leaving Pudong on the 27th of April; obviously within the two days as agreed upon.**

3

Neither Air Bill, however, were signed off by either of the issuing Carriers or their agent, Apex, and neither represented a complete document; only the first page of a copy of each Bill eventually was emailed to the Consignor. Both Air Bills, therefore, were deficient in respect of the information required to be part of any Air Bill. Neither had the Consignor been apprised of the reason for the split Shipment. This was the first time that the Consignor learned that the Shipment **actually** had been broken up but only **after the Moscow Shipment already was airborne if not already in Moscow.** [3]

Flight SU 209 appeared to be an international flight which travels between Shanghai and Moscow; however, it also appeared not to continue to New York **and, in fact, after arriving in Moscow it did not leave for New York for at least several weeks.** [4]  Nonetheless, it appears that either Aeroflot did not offer a direct flight to New York which would have arrived in two days, or Apex, the freight forwarder, did not make sure to choose a flight scheduled to arrive within two days.

The first half of the Shipment, carried on Flight CA 1019, arrived in New York on April 29, 2020, as expected, agreed to, and contracted for between Consignor and Apex, two days after having been shipped by the Consignor. In turn, after pick-up by NFI those Masks timely were delivered on behalf of the Consignee to its Vendee in Los Angeles.

While Apex shipped half of the Masks **directly to New York**, **as agreed upon with the Consignor**, the second half of the Shipment, without any explanation by Apex to the Consignor or the Consignee, **was diverted to Russia and then, somehow, to New York arriving on May**

---

[3] Plaintiff has never been provided with an Air China or Aeroflot Air Bill, or the back of the Apex Air Bills.

[4] Actually, it is unknown whether the very same plane was the one which finally left for New York a few weeks later to deliver the Masks, or just another plane bearing the same flight number, SU 209, or even whether it was Aeroflot SU 209; it is unknown whether it was another Aeroflot plane with a different number?

19, 2020, some 22 days thereafter and obviously **after it was contracted to arrive.** The Masks presumably sat somewhere in the Moscow airport, or in a warehouse in the confines of Moscow, for approximately twenty-five (25) days. [5] The second part of the Shipment was finally received by Apex in mid-May, too late to be delivered to the Vendee on the West Coast. By that time NFI's Vendee had looked for, and found, another source of Masks rejecting NFI's attempts to try to ameliorate the situation or to persuade the Vendee to accept a late delivery. *Inter alia*, because NFI essentially had no explanation or information to impart to its Vendee as to why that part of the delivery was late, having been affirmatively stonewalled by Apex, it could not persuade its Vendee to accept the Shipment. In addition, apparently at least six (6) crates of Masks in the Aeroflot Shipment, **crated by Apex**, were damaged, **although there is no indication as to where, how, and by whom they were damaged.**

The Vendee then also refused the additional 2,000,000 Masks which, though not needed as expeditiously as the first 1,000,000, already had been purchased by NFI and shipped by sea from China to Los Angeles where they sit today in a warehouse.

Despite a number of requests prior to the inception of this action, Apex refused to provide either the Consignor or Consignee with the back of either Air Bill. Furthermore, although requested several times from Apex by both Consignor and Consignee, including by counsel for Plaintiff, Apex outright refused to provide a copy of the back of its Air Bill; rather, it alluded to Aeroflot's contract of carriage and Air Waybill but which it also has refused to produce. **To date, neither defendant has provided Aeroflot's Air Bill** which would have been necessary for that leg of the trip.

---

[5] If damaged by land transportation outside of the Moscow airport then the damage again did not occur while airborne, or during a contract for air transportation because any air transportation ceased for at least close to three weeks.

During the ensuing days of the second delivery, conversations between Hui Wang of NFI ("Wang") and Calvin Tseng ("Tseng") of Apex, engendered by Mr. Wang's inquiries of the whereabouts of the remaining 500,000 Masks, elicited several different, unconfirmed excuses why the Shipment had been split, initially from a problem with "gassing the airplanes," to some "military use" of planes by the Russian government, to "overbooking," to "problems with the plane" in Russia, to getting the Masks too late to be consigned to the Air China flight. [6]

Neither the Consignor/Shipper nor NFI had ever been informed by Apex, **prior to shipping** the Cargo, that one half of the Shipment **would not be on a direct flight to New York as directed and bargained for, or why, or that part was going through Russia**, until after the fact; **neither was the Consignor offered an option to pay a higher rate for another direct flight for the second part of the Shipment going to Russia if that, under the circumstances, were the only unavoidable consequence,** or even the necessity to retain another carrier, or choosing another means of carriage. [7] **The Consignor, entitled to be so informed of the logistics of the Shipment before it left China, did not find out about the split Shipment until it was *fait accompli* and half of it either was in transit to Russia, or more likely already there.**

Despite Apex having contracted Aeroflot to transport the second half of the Mask Shipment, Apex, with a direct line to Aeroflot, never has proffered any reason why the Shipment either sat in the airport in Moscow for more than 20 days, or was off-loaded there in Moscow, despite several requests by NFI for information, or when Apex knew that it was delayed. When the second half of the Shipment finally arrived in New York, Apex refused to release the goods

---

[6] Really? Too late? Apex had **all the Masks in its possession** so this excuse was just too lame to even consider.

[7] After all, from the Apex Invoice it is clear that Apex knew, and affirmatively had contracted for a two-day delivery by direct flight to New York. And, at that point, transportation by sea would take 5-7 days; way less that what was occasioned here.

to NFI until all freight charges for all the Masks shipped by Apex were paid despite that by that time these 500,000 Masks could no longer be sold to the Vendee due to Defendants' negligence which had caused NFI to fail to meet its delivery obligations to its Vendee. Without possession of the Masks, NFI could not even attempt to try to sell the delayed Cargo because by that time the market for Masks needed in the Covid-19 pandemic had attracted hundreds, if not thousands, of other suppliers and the market was beginning to become saturated.

Plaintiff has lost Seventy Thousand ($70,000.00) Dollars for the costs of manufacturing the 500,000 Masks it could not deliver and which sit at JFK, and Three Hundred, Sixty Thousand ($360,000.00) Dollars for the additional 2,000,000 Masks it could not sell to its Vendee; and it has lost the costs and disbursements for shipping the other 2,000,000 Masks, as well as the profits thereupon which it otherwise would have made on the sale of all the Masks to the Vendee; in total, it has been damaged in excess of One Million, Six Hundred and Fifty Thousand ($1,650,000) Dollars. The Defendants, individually and severally, are liable to NFI for the damages sustained by the Plaintiff as occasioned by the non-performance and as explained, *infra*.

## LEGAL STANDARD FOR DISMISSAL

### Motion to Dismiss

A Rule 12(b) (6) motion enables a court to consider dismissing a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b) (6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, **accepted as true**, to `state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

A claim is plausible on its face "when the pleaded factual content allows the court to draw **the reasonable inference that the defendant is liable for the misconduct alleged**." *Id.* (citing *Twombly,* 550 U.S. at 556). "The plausibility standard is not akin to a `probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The factual allegations pled "must be enough to raise a right to relief above the speculative level. *Twombly,* 550 U.S. at 555." See also *Cocca Rau v. Standard Ins. Co*., (S.D.N.Y. 2020; 19-cv-6149).

"When there are well-pleaded factual allegations a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Thus, the court must "take all well-pleaded factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff []."*Leeds* v. *Meltz,* 85 F.3d 51, 53 (2d Cir. 1996).

The issue is not whether a plaintiff ultimately will prevail but whether the claimant is entitled to offer evidence to support the claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982); *accord* Di Folco v. MSNBC Cable L.L.C.*, 622 F.3d

104, 113 (2d Cir. 2010) ("In ruling on a motion pursuant to Fed. R. Civ. P. 12(b) (6), the duty of a court is merely to assess the legal feasibility of the complaint, **not to assay the weight of the evidence** which might be offered in support thereof." (citation and internal quotation marks omitted).

## Montreal Convention Does Not Apply Here

Defendants contend, *inter alia*, that that the Montreal Convention (the "Convention") applies to the Shipments in question and that the Convention exclusively governs and preempts all of NFI's claims (p. 5 of Defendants' Memorandum). As will be seen, *infra*, the Defendants are wrong.

The Montreal Convention provides an affirmative defense to state-law claims. However, the U.S. Supreme Court and some district courts have not decided whether it completely preempts them. The lower courts that have reached the issue are split. *Jensen v. Virgin Atl.,* 2013 WL 1207962, at *3 (N.D. Cal. Mar. 25, 2013). *Compare Rocha v. American Jets, Inc.,* 2014 WL 12626317, at *3 (S.D. Fla. Nov. 17, 2014) (Montreal Convention does not completely preempt state-law claims); See also *Zatta v. Societe Air France,* 2011 WL 2472280, at *2-3 (C.D. Cal. June 21, 2011); *Narkiewicz-Laine v. Scandinavian Airlines Sys.,* 587 F. Supp. 2d 888, 890 (N.D. Ill. 2008);  *Schoeffler-Miller v. Northwest Airlines, Inc.,* 2008 WL 4936737, at *3 (C.D. Ill. Nov. 17, 2008)

Courts that have considered the preemptive effect of the Montreal Convention's predecessor treaty, the Warsaw Convention, have also reached different conclusions. See *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.,* 522 F.3d 776, 781 (7th Cir. 2008) **(holding that the Warsaw Convention "simply operate[s] as an affirmative defense").**

However, this Court need not decide whether the Montreal Convention has a complete preemptive effect because Defendants have not shown that it applies to NFI's claims. Two provisions of the Convention establish the liability of airlines to Cargo, Articles 18 and 19. *Jensen,* 2013 WL 1207962, at *3 n.3.


## Article 19 Does Not Afford an Affirmative Defense to Defendants

Defendants contend that NFI's claims fall under Articles 18 and Article 19 of the Convention and therefore are preempted by the Convention. Thus, the Convention can create federal-question jurisdiction only if those Articles apply. Defendants, however, have not shown that Article 19 applies to the facts at bar.

Article 19 governs claims for delay in international transportation for passengers, baggage or Cargo.  But, "[t]he plain language of Article 19 of the Montreal Convention indicates that it governs claims for delay**, not nonperformance**. "*Irabor v. Lufthansa,* (D. Mass. 2019, 19-cv-12087-FDS) citing, *In re Nigeria Charter Flights Contract Litig.,* 520 F. Supp. 2d 447, 452-453, 455 (E.D.N.Y. 2007).

"[W]here a plaintiff claims total nonperformance of the contract, courts scrutinize the facts to determine whether the claim, however founded, actually arose out of a delay in transportation." *Kamanou-Goune v. Swiss Int'l Airlines,* 2009 WL 874600, at *4 (S.D.N.Y. Mar. 27, 2009).  However, "…the carrier shall not be liable for damage caused by delay **if it proves that it and its servants and agents took all measures that could be reasonably required to avoid the damage o**r **that it was impossible** for it or them to take such measures." *In re Nigeria*, at 452-453. This is the Defendants' burden.

The contract between Apex and the Consignee called for a direct flight from Pudong to New York **with a two day delivery.** And, for a reason! The Defendants here would have to prove that they took all measures to avoid the damage, the delay, which in this case is a complete nonperformance, or that it was impossible to avoid. Unconfirmed throwaway lines such as "overbooking" and "problem with the plane in Russia," etc. will not carry the day especially when considering why Apex put the Shipment on anything but a direct flight in the first place, and on anything but a flight that was to land in New York in two (2) days. So, whether there was a problem with the plane in Russia is of no moment. The Shipment should not have been on that plane! And, if so, Apex needed to apprise the Consignor for the reasons previously stated, **including giving the Consignor alternate arrangement choices, or giving Consignor the opportunity to seek alternate means on its own.** But, Defendants never offered alternate shipping arrangements or the opportunity for the Consignor/Consignee to choose that alternate opportunity and, as such, Defendants cannot avail themselves of an Article 19 affirmative defense. See also *Weiss v. El Al*, 433 F. Supp. 2d 361, 367 (S.D.N.Y. 2006)

Several courts have held that where an airline prevents a plaintiff from boarding a flight **and does not offer alternate travel arrangements**, then the plaintiff's claim arises out of **nonperformance and is not preempted by Article 19**. Here, the Consignee did not get the benefit of the bargain for which it contracted, a two day delivery on a direct flight; but, more importantly, Plaintiff could not do a thing about it because by the time it was informed the Shipment was sitting somewhere in Moscow. This is not a delay; this is non-performance. *See Wolgel v. Mexicana Airlines,* 821 F.2d 442, 444-45 (7th Cir. 1987) (interpreting parallel provision in Warsaw Convention); *Nankin v. Continental Airlines, Inc.,* 2010 WL 342632, at *6-

8 (C.D. Cal. Jan. 29, 2010); *Kamanou-Goune,* 2009 WL 874600, at *5; *In re Nigeria Charter,* 520 F. Supp. 2d at 454-56.

At least on the present record, that appears to be the case here. Apex failed to put the Cargo on a direct flight to New York and both Apex and Aeroflot failed to offer alternative arrangements. In fact, as pleaded, Apex did no more than proffer one excuse after another for why the Masks did not get shipped on the Air China flight, and why the Masks never left Moscow. The inference, or perhaps the immutable fact, is that Apex knew it had breached the contract of bailment.

There is no indication in the record that Defendants informed Plaintiff that it was putting half the Shipment **on an indirect flight—a breach—**and, to be truthful, the Consignor never would have agreed. Moreover, there was no offer to Plaintiff of alternate arrangements. Thus, Defendants, in essence, bumped the Shipment from the contracted for direct flight, and breached that contract by putting half the Shipment on a flight that was not scheduled to arrive in New York for weeks.[8] Defendants, therefor, have not shown that Article 19 applies.

The reasoning of *Wolgel, supra, is* persuasive and applies here. The plain language of Article 19 of the Montreal Convention indicates that it governs claims for delay, **not nonperformance**. Moreover, as the Seventh Circuit explained, the drafting history of the Warsaw Convention's Article 19 — whose pertinent language is identical to its Montreal Convention counterpart — **clearly indicates that it was not intended to cover claims for nonperformance.** As already noted, the Supreme Court has observed of the Warsaw Convention, whose preemptive effect is the same as that of the Montreal Convention, is that "[its] preemptive effect on local law extends no further than [its] own substantive scope." *El Al*

---

[8] Here, not giving NFI the opportunity to choose alternate arrangements even on its own in light of Apex's failure to do so, is actionable.

*Airlines* v. *Tseng,* 525 U.S. 155, 172, 119 S. Ct. 662 (1999). Because NFI's state law claims are grounded in nonperformance, not delay within the substantive scope of Article 19, the Court should find that Article 19 does not preempt Plaintiff from pursuing its claims. *In Re: Nigeria Charter Flights Contract Lit.,* 520 F. Supp. 2d 447 (E.D.N.Y. 2007). The breach of the bailment by Apex is palpable. The terms of the contract were clear. [9]  As stated by the Court in *Mullaney v. Delta Air Lines*, 2009 U.S. Dist. LEXIS 51039 at *6-7, 08-cv-7324 (S.D.N.Y. 2009) (McMahon, J.), "defendant characterizes its failure to transport the plaintiff from Paris to New York due to the Air France strike as a 'delay.' I, like plaintiff, disagree. Plaintiff is seeking damages resulting from Delta's refusal to provide him with any flight home after having taken his money for a ticket—in short to perform its obligation to provide carriage in exchange for money it had received. **That is not delay—it's non-performance….not preempted by Article 19 of the Convention."**

Of course, generally speaking, one cannot dress up delay as nonperformance simply to avoid falling within the purview of the Convention. However, **that logic is not applicable to a contract where delay would be tantamount to nonperformance,** and, more importantly, a delay without any explanation or without any ascertained reason, **and no offer of alternate carriage.**

The Defendants took the Plaintiff's money for transportation of Cargo on a direct flight to New York in two days, not twenty. It breached a material term of the contract rendering the

---

[9] There was a world-wide health emergency dictating that the Consignee/Consignor direct Apex to retain a two-day, direct flight to New York. Not to be maudlin, but by analogy if a hospital or clinic had to transport a heart from Phoenix for a transplant in Boston, and is directed to retain a qualified service such as the United Network for Organ Sharing ("UNOS") to transport the organ so that is delivered within 7 hours of receipt, that service should not retain just any flight but one which is scheduled to deliver the organ timely. A "delay" is literally deadly to the recipient. Would it be an affirmative defense that the service "booked" a cheap connector flight from Phoenix that not only makes two connections, one in Houston and one in Atlanta, but has a 4 hour layover in one of those cities, 12 hours overall?  The agreement was to book a flight scheduled to land before the ice for the organ melted; anything else is nonperformance.

delay a nonperformance and this clearly is a question of fact a reasonable juror could conclude to be the case. Defendants did not perform that contract.

**Article 18 of the Convention**

Article 18 of the Convention equally does not serve as an affirmative defense available to the Defendants. **The plain language of Article 18 draws the line at the airport's border, a very distinct point.**

The Convention's coverage **excludes any transportation by land outside of the airport**. Although Article 18 creates a presumption that any damage or loss occurring during the performance of a contract for air transportation was the result of an event during transportation by air, that is, on board an aircraft or within an airport. **The presumption may be rebutted by evidence demonstrating that the loss occurred on land outside the airport.** *Victoria Sales v. Emery Air Freight*, 917 F. 2d 705, 708-709 (2d Cir. 1990); See also *Tata AIG Gen. Ins. Co; v. British Airways, 2013 U.S. Dist. LEXIS 89830 *34-37.*

Article 18, per the suggestion of the Defendants, does not limit the meaning of "transportation by air" to "actual" air transportation. Rather, as the plain language of Article 18 directs, "transportation by air" would include a loss occurring while the Cargo was in the air *or* on the ground **but within the confines of the airport's boundaries**. Defendants likely would argue that even if there is undisputed evidence that the loss occurred outside of the airport during transportation by land, the Convention governs as long as the land transportation was part of the carriage contract. This interpretation would effectively render nugatory Article 18's command that **"[t]he period of the transportation by air shall not extend to any transportation by land ... performed outside an airport."** This cannot be the result intended by the Convention's drafters.

14

Because the Shipment was damaged under the prevailing circumstances it is equally conceivable that the damage occurred outside of the airport; either by Apex when it crated the Masks a day, or two, or three before; or in Moscow during the twenty (20) odd days when it was sitting **someplace or the other and not with the carrier**. Moreover, this aborted Russian flight cannot be interpreted to be ongoing when there was no reason proffered for why it sat for so many weeks; **if it was out of commission it was not in transportation**. This also is a pure question of fact and one for the trier of fact, not the Court on a motion to dismiss. [10]  If the damaged occurred outside the airport, the presumption favoring Convention coverage has been rebutted and the Convention does not govern. *Victoria Sales, supra*. A different interpretation might be more "sensible," but to engraft such an interpretation onto the plain language of Article 18 would require an impermissible judicial amendment of the Convention. *See Chan v. Korean Air Lines,* 490 U.S. 122, 109 S.Ct. 1676, 1684 (1989).

Accordingly, even assuming that the Montreal Convention completely preempts certain types of state-law claims, Defendants have not shown that it applies to the claims asserted here. The Convention therefore does not provide a basis for federal-question jurisdiction.

**Incomplete Air Bills**

As stated hereinabove, the Apex Air Bills were incomplete, and there were no Air Bills furnished to Plaintiff for either flight which were issued by Aeroflot or Air China.

**Evidence of Contract**

---

[10] A reasonable juror could conclude that the crates were damaged outside of the Moscow airport because it is inconceivable that the Shipment would sit on an idle plane for more than 20 days and that the particular plane was not in transit for those days. Since the Aeroflot flight was not a direct one, the damage to the Shipment when in Russia could not be considered to be an event during the performance of a contract for air transportation as there was no air transportation for twenty some odd days. This is a question of fact for the trier of fact, not to be decided by the Court on a motion to dismiss, as well as to whether it was Apex which damaged the crates days before lading the Shipment, or it could have been damaged somewhere in Russia when unladed after the first leg of that connector flight.

Without converting a motion to dismiss into one for summary judgment, a Plaintiff may include, and a district court may consider, documents outside of the pleadings but only if that document was incorporated by reference therein or cited and/or relied upon in the Complaint as is the case here.

Although the legal standard on a motion under Rule 12(b) (6) is well known, it bears repeating. "In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Coggins v. County of Nassau,* 988 F. Supp. 2d 231, 240 (E.D.N.Y. 2013), *aff'd in part, appeal dismissed in part sub nom. Coggins v. Buonora,* 776 F.3d 108 (2d Cir. 2015). In addition to "the factual allegations in the complaint," the record on a motion to dismiss is limited to, "documents attached to the complaint as an exhibit or incorporated in it by reference"; "documents upon whose terms and effect the complaint relies heavily, *i.e.,* documents that are `integral' to the complaint"; and "matters of which judicial notice may be taken." *Polanco v. NCO Portfolio Mgmt., Inc.,* 23 F. Supp. 3d 363, 369 (S.D.N.Y. 2014) (quoting *Calcutti v. SBU, Inc.,* 273 F. Supp. 2d 488, 498 (S.D.N.Y. 2003)). Any other documents presented to the court must be "excluded," or else the court must "convert the motion to one for summary judgment **and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56."** *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 154 (2d Cir. 2002)**.**

Certain written instruments attached to pleadings may be considered part of the pleading. *See* Fed. R. Civ. P. 10(c). Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim. *See Van Buskirk v. CNN,* 284 F.3d 977, 980

16

(9th Cir. 2002); *Branch v. Tunnell,* 14 F.3d 449, 453-54 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir.2002); *Venture Assoc. Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 431(7th Cir.1993). The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6). The doctrine of incorporation by reference may apply, for example, when a plaintiff's claim about insurance coverage is based on the contents of a coverage plan. S*ee Parrino v. FHP Inc.,* 146 F.3d 699, 705-706 (9th Cir. 1998). Or when a plaintiff's claim about stock fraud is based on the contents of SEC filings. *In re Silicon Graphics Secs. Litig.,* 183 F.3d 970, 986 (9th Cir.1999).

Without converting a motion to dismiss into one for summary judgment, a plaintiff may include, and a district court may consider, documents outside of the pleadings but only if that document was incorporated by reference therein **or cited and/or relied upon***.*

Appended hereto as **Exhibits A** and **B** are the Invoices sent by Apex to NFI for the freight charges on the Air China flight and the Aeroflot flight, respectively, coupled with the corresponding Air Bill for that particular Shipment, neither of which were sent to either NFI or the Consignor until after the two flights were long gone. Both Invoices, dated April 26, 2020, indicate a departure date the next day, April 27, 2020—which occurred--**with a destination date for delivery in New York of either the same date in the case of the Air China flight, or the next day in the case of the Aeroflot flight; in other words within two days.**

Both of the Invoices, dated one *day earlier than the flights were scheduled to leave,* clearly indicate that Apex was aware of that to which it had agreed, and that it understood the necessity of direct flights if the Shipments were going to arrive in New York on the 27th and 28th

of April, respectively, as stated on those Invoices. It is obvious therefore that Apex was in error when it placed half of the Shipment on the Moscow-bound flight, **an indirect flight** which could not, even without all of the cited melodrama, have gotten the Masks to New York per the agreement.

## <u>CONCLUSION</u>

For the reasons stated herein, the Defendants' motion should be dismissed, and the Defendants directed to answer the Amended Complaint.


November 6, 2020
New York, N.Y.                                      LOUIS J. MAIONE, P.C.

                                                   By: *Louis J. Maione*
                                                   Louis J. Maione, Esq. (8589)
                                                   303 East 57th Street, 30th Fl.
                                                   New York, N.Y. 10022
                                                   (917) 549-5693
                                                   Attorney for Plaintiff